This is valid under Hawaiian law. But to satisfy any people who think you've got to have a court decree, we'll make it non-pro-frontal. But they don't depend on that. Well, it is stated in our brief that we think that this order is questionable. That's on page 13 at footnote 3. No, I understand your position. I understand your frustration. But on the other hand, we see a lot of state court judgments we think might be questionable. But except in areas like habeas, they bind us. We just have to take them for what they are. And that's what I'm struggling with here. Even if the state court – I mean, we presume that the state court's not going to do anything that's fraudulent. You may think it's questionable, but it was entered. And they say, here's the way the law works in Hawaii. Stipulation alone is enough. But just to see that we're doing non-pro-frontal. Now, it seems to me we're bound by that interpretation of Hawaii law. And if that's true, and the legal fiction is that it was accomplished before the appropriate date, then that presents a problem. And I'm well aware of the First Circuit's analysis on that. But I'm just explaining what troubles me about this so you can respond. Well, all I can say, Your Honor, is that the government has to look at these cases. You know, they're coming in 15 years – more than 15 years later and trying to look at it. You know, he had 11 years during which he could have naturalized, and he didn't do it. And now, all of a sudden, he's convicted of an aggravated felony. And so he pulls his family together, and they say, well, what can we do? Right. But then – I mean, you do have to then presume that the state court sent Hawaii a party to the fraud, if you think it's fraud. And that's something I don't think we can really presume. I'd say, well, okay. I mean, I just don't think that a family court in Hawaii would say, this is the way the law works, if it weren't for the rule. It's a difficult – I recognize a difficult area. And for you, it's frustrating because you think that, in fact, they're trying to alter history. I understand completely, but I'm just struggling with the legal problem. Well, consider the practical problem for the agency, Your Honor, for the State Department and for the board and the immigration judge and the immigration service, Department of Homeland Security now, trying to look back. And so the results of this, I think, would be that they need to look to – they won't have a practical test. What – there was legal custody awarded in this case in 1970. It wasn't changed by order before he was 18. That's the rule that – But that's not the rule in the statute. I mean, if the state court says, we are instruing our prior order, and if it's not clear enough, we're making a nine-to-four talk, and that has legal effect, why isn't that bright line enough? Well, I – You should have a court – an imprimatur of a court on what happened. Well, I'm not sure how that's consistent with state law. The state law, it says – Right, but how far is it behind that? The custody created by the court's decree, which imposes. So I guess the idea is that when the petitioner was 33, then with this non-protunct order, it imposed the relationship back when he was 15. Right, but I mean, the whole – I mean, the protection of the system is that you have to go to a court that's competent in jurisdiction and get the order. And if you allege it's fraudulent, I expect, you know, that's – but you do have to persuade the court of it. Well, I guess the strongest point I have, Your Honor, is that what it says in this non-protunct order appears to be inconsistent with the definition of legal custody. Right, but see, there's my problem. I don't see how we can look behind a white law to say – I mean, Rupert Feldman would prevent us from saying the Hawaii court was wrong because we don't have jurisdiction to declare what the – that the Hawaii judgment was incorrect. I think the only argument – I mean, the clear argument is, as a matter of federal law, can a non-protunct order suffice to meet the statutory requirements? I mean, that's the only argument. Right, and obviously – That's not an easy question, but that's what I'm discussing with you. I need to kind of outline what I see to be some problems in the case so you can respond. Right. I mean, that's our point, is that a non-protunct is not sufficient because it has to be – it has to be clear in the law. It has to be clear by the court's order before the person is 18. Now, counsel is correct. If there's no order regarding custody, at least under immigration law, it's been interpreted that it's the custodial parent, which in this case – See, I have the same problem. This first argument that I do with the non-protunct order is that we have to presume it had jurisdiction. I don't think we can look behind the custody order to say, well, no, there wasn't service. It was used out of the country under a white law. It wasn't valid. I agree with that, Your Honor. But I have – that's the problem I have with a non-protunct order, too. I think for examination, he stops there. I don't know. Well, our position is – No, I understand. Your Honor, it is frustrating because I think in the – How many cases do you have that when State courts change their mind? You know, there's one in Massachusetts and maybe one in Philadelphia. There's a case Miller v. Christopher in the D.C. Circuit that was affirmed by the Supreme Court. In that case, the petitioner was trying to get a non-protunct order. It wasn't exactly like this, but it involved citizenship. I think it was a legitimacy case. The petitioner's father was a citizen and mother was not. There's a whole issue that the person has to be legitimated before they're 16. And in that case, the petitioner was in her 20s, and she got the order and then sued for acquisition. Again, in that case – like in this case, although the statute is different. And the court there said, no, you can't do it later. It had to have been satisfied before. It's a little bit different. It's not a non-protunct order, but it's a later – it's a later statement that the earlier fact was true. I mean, if he's her father now, he was her father back then. It's a similar sort of situation. And the court there said it had to be satisfied before the petitioner turned, I think, 16 in that case. And we do see these cases, Your Honor. This isn't a rare situation. And the fact is, if non-protunct orders are considered appropriate, we're going to see a lot more. I'm confident of that. I guess you'll be coming out here a lot more. I hope they come from Hawaii, anyway. Did you have another question? Yeah. I'm still, I guess, at the level before Judge Thomas' level of non-protuncts. And I'm still on the question of why, when Hawaii says that you don't need a court order at all to transfer custody after a court order, that the private agreement of the parties is sufficient and they recognize that, why that is improper under Hawaii law. I've looked at your footnote where you say a non-protunct order is improper without saying it is or it isn't. I don't see my problem. I don't see why this depends on the non-protunct. Once the court has said that agreement under Hawaii law was sufficient to affect the transfer and you don't have to come to court, what is it that's improper about that? I just think that it's a more difficult standard for someone to become a citizen, Your Honor. And I think that the requirement that the service and the State Department have put on this and their understanding, based on Hawaii law, Section 571.2, that there needs to be a court order in this matter. When there's been an initial award of custody, the court needs to... I can understand that argument. I mean, I can understand that somebody saying, yes, that should be the rule. When there's an award of custody, if you want to change it, then you go back to court. And maybe Hawaii is wrong in saying that in Hawaii you don't have to do that. But don't they have a right to say you don't have to come back in Hawaii and you do change custody in this matter? And don't you recognize that if that is the state law? Your Honor, I think to the extent that it affects whether this person automatically became a U.S. citizen, they did need to go back to court. Because state law is not determinative of citizenship? If the state says that... If the state says... We do look to state law. I'm going to give you a certificate. Don't come back to court. But when you have a letter, just register it with the Secretary of State and we'll issue you a certificate that you are now in the custody of your father. Well, if that's what state law said, I think that would be appropriate. Well, that's what the state decree says. State law here says the relationship created by the court's decree. That's what I'm looking at, Your Honor. I'm looking at the statute. And that's what... Right, but I think Judge Brenner's point is if the family court is correct in saying that it was not necessary for the parents to come back to court to change their main decree, it was in purview of their authority to change legal custody, if that's a correct statement of Hawaii law, then that's a different case, apart from the non-court aspect of the court later discussed. Well, that's... If they're right. If the state court is right. I don't think I have a satisfactory answer, Your Honor. I regret to say. Unless there are any other questions. Well, we don't want you to go away unhappy. Don't you? At least we hope you have a nice weekend. Thank you. We want to get the law right on this, and that's why it's so difficult, because there are state interests involved, and I understand that. Well, I would just refer the court to the First Circuit's decision in Fiero, which is on the facts, and generally speaking on the law, identical to this case. It points out the problems to permitting this type of change in custody to affect whether someone becomes a citizen or not. I mean, it's not something that someone applies for, the parent goes in or the child. It's something that happens automatically, and I think Congress wanted to limit it to certain situations, and I don't think this type of change of custody, because really what happened is that he wanted to come to the United States. His parents wanted him to come to the United States. He had never lived with his father. In fact, his father wasn't there when he was born. He came here when he was 15. But you see, he came and he went with his father, and you wouldn't have had a bit of a problem if they had just walked down the hall to the court and said now change custody. It would have been perfectly fine with you. Yes, Your Honor. No great policy would have been involved. If there were no order. If what? If there were no order at all, if he'd just come and the father had physical custody. Under the board's law, that's correct, too, Your Honor. But the fact, I mean, the State Department and the service have to be able to look at something. And what was presented here to them was the marriage certificate, the birth certificate, and the divorce decree, which said that custody was given to the mother in 1970 and never changed. Well, there was no indication that it had been changed. And our position is that it needs to be, it needed to be entered with the court when it was done, in the claim in 1984, and that the 1970 order of the court stands. And unless it was changed before he was 18, a later statement is ineffective. Thank you. Thank you very much. Can I just make one point? Yes, certainly. You have one minute or two left. Basically, I just would like to point out that the reason that the parties apparently went back to the State Court was because they had gone to the State Department on an application for a U.S. passport, and the State Department said, absent a decree changing the legal custody, we have to go by that original decree which was issued years ago. But since there's no State Court decree changing the custody, then we cannot approve him as a U.S. citizen. So seeing that, they went back to the State Court, even though it's years later, and the State Court basically said that the court has already outlined. So that was the motion to try to satisfy all the government requirements. That's the only point I wanted to add. Thank you. Thank you, counsel.  The case just argued will be submitted. The next case on the calendar is the United States v. Rutkowski. Good morning again, Your Honors. Good morning. Donna Dotson representing the appellant defendant, Mr. Rutkowski. I'd like to start. Our argument in this case is that there was sufficient evidence to support either of the convictions, Mr. Rutkowski. So I'd like to start by comparing two cases to this case where this court, the Ninth Circuit, did reverse two drug cases based on insufficiency of the evidence. The first one would be U.S. v. Ramirez. In that particular incident, the defendant whose case was reversed, he was a passenger in a truck that was carrying over 46 pounds of marijuana. He was friends with the person that was driving the truck. He had gone to his house for dinner, had many different occasions where they had done things as friends, and he was riding in this truck when they crossed the border. The customs agents noticed that they just looked a little suspicious, so therefore they stopped them to do some further investigation. They noticed that the defendant, Smith, was very nervous, and he asked them to pull out the ashtray. He was extremely nervous and just acted like something was wrong. His hands were trembling, and so therefore they did a further investigation and found the drugs in the tires of the truck. Well, the court found that this was insufficient evidence to show a drug conspiracy just because he knew maybe there were drugs in the truck or for the mere presence that he was there in the truck with the drugs and that the friendship between the two defendants in this case was vacated. The next case is U.S. v. Batista-Avilla. In this case, there are even more facts to show that the defendant possibly was guilty of a conspiracy. However, the court again ruled that there was insufficient evidence to prove beyond a reasonable doubt. In this case, DEA agents were working, I guess, a sting operation trying to get these drug dealers, and they had been instructed to go to a particular hotel room in order to consummate this drug deal. Well, the defendant, Batista, had rented this hotel room. He was in the hotel room at the time the drug bust went down. He was driving one of the vehicles that was supposed to be in and was testified as being as part of these two vehicles in this particular drug operation. Both vehicles crossed the border within a minute of each other. In addition, this particular defendant had $5,000 that he gave to another defendant to hold. It was hidden in one of the cars, and that was the same amount of money that one defendant was supposed to get for his part of this deal. Even though all of these facts, the defendant was present, did everything, was involved when the drugs were even recovered, the court found it was insufficient evidence to convict him on this drug conspiracy. Turning to the present case, in any of these two cases, I might add, that it said mere casual association with conspiring people is not enough. Mere friendship is not enough. And in this particular case, that's exactly what we have. We have a person that was... It's not that somebody saw him with people and said, you were around at the time. In this case, you have testimony by the people who said that he would participate in it. Well, you only have one person, Your Honor, that said that. You have Ravy, who said that he gave him the drugs. The other two co-conspirators of this case who testified said they didn't know where the drugs came from. They didn't have any idea. He went into the bathroom and examined the drugs. That was the... Again, there was conflicting testimony between... Okay, conflicting, but that's testimony. But it's not enough, Your Honor. There's still... I mean, there's evidence that the government presented in these other cases, and they found it was inconsistent. The thing is, you have one person, and all three of these defendants, co-conspirators that testified, they all testified and got extremely low sentences compared to Mr. Murkowski, who received a lesson. That unfortunately happens all the time. That's correct. However, if you look at what they said, and it was pointed out in the briefs, the testimony did not go together. It was not consistent. They didn't agree on what was said. There's too many holes in the testimony. For one thing, Your Honors, I think it's very important to look at... First of all, there was no direct evidence linking Mr. Murkowski.  Were the fingerprints of the other three worked on on the drugs? When they did a search of the defendant's house, there was no money, no drug paraphernalia, no drugs. However, search of the other three co-conspirators, there was money, drug paraphernalia, and other drugs were found. Nothing at Mr. Murkowski's. The only thing that was found was a frequent flyer planned, laying on the floor in the living room with notes on it. It was never... There was no testimony that confirmed that he wrote them. There was really no testimony that could show exactly that that was a drug ledger, as was alleged. Plus, it was in the living room by a TV stand. There were many people living in this house, so there's no testimony directing that it was his. The frequent flyer invoice belonged to his father. If you look at when could Mr. Murkowski have even gotten the drugs, I think that's so important to look at. When was their time? And if you go through the facts of the case, there was only a short time period where Mr. Murkowski was not with his family. He was on vacation with his mother, his two sons, his brother, his girlfriend. They met with his aunt and her daughter and boyfriend in Las Vegas. She rented the van. They drove. I mean, they're together. They packed the bags. And he would have had to get his mother's permission to get the drugs, too. He had to get mother's permission to be able to take the car, to be able to go pick up his friend, to take him to his hotel. But when could he have been? And then they went back afterwards, they said, to get the permission to go do something else. Correct. He had to come back. He said he never did anything without getting his mother's permission. That's correct, Your Honor. He had been in trouble before. Well, you know, he had been in trouble before, and he was living with his mother at the time, and taking care of his two children. He had custody of his two children. He hadn't been in any drug-involved case since 1993. This was 2000 that these particular incidents happened. He had been clean. He hadn't been involved. You know, the government alleged, oh, he was this big drug dealer and drugs all the time, but there was no evidence to that fact. There was no concrete evidence. Everything was circumstantial based on, Rady was the only one that said he gave the bag to him. But no one else saw that transpire. No one else. There was no other involvement. But if the jury believed Rady, isn't that the end of the case? No, I don't think it's the end of the case, Your Honor, because I think the government still has to prove beyond reasonable doubt that all of this evidence could convict him of a conspiracy that he was involved. Not just believing that Rady said it, because Rady lied on the stand. Rady was not truthful, and Rady was involved in drugs at the time, and he admitted it. He had gone in January for a drug deal. He had borrowed money to do a drug deal. You know, there were too many facts that are outlined in the briefs to show that Rady was the one that was in charge. Rady is the one that told Hilton, pick up the bag and carry it out. You know, there are some places where they say that it's not enough to convict someone on the basis of a co-conspirator's testimony, because they're not always very believable. And some states have rules that say you need other evidence, but that's not the federal rule. You can convict someone on the basis of a co-conspirator who may be wanting to shift the blame, and it happens in narcotics cases all the time, that the witnesses are people who are liars, crooks, criminals, and that's how they make these cases. But, Your Honor, I still believe that the government must still prove that a rational jury could have found, based on the evidence that was presented to the jury, that beyond reasonable doubt he was involved. And if there's just a few things that they had to show that by Rady saying a couple, just that he gave me the bag, when if you look at the evidence and the timelines, how could Mr. Rakowski have even gotten these drugs? There was a time span when Rady called him and said, look, I need you to take me to my hotel, and the time span between then and between the time that he picked him up, how could he have negotiated when he, first of all, didn't even know he was going to be in L.A.? The whole story doesn't make a lot of sense. Rady called and said, you have to pick me up to take me to my hotel, so then he told Rady to take a cab to another hotel, and then he'd pick him up at the other hotel and take him to his hotel. Why didn't he tell him to take a cab to the hotel that he wanted to go to?  So he took a cab there, which was quite a distance from L.A.X. Airport, and what he did, because Mr. Rakowski was unfamiliar and he'd already testified he'd gotten lost that day and that they were still in L.A., he said he wasn't familiar enough to get from where he was to the airport, and L.A.X. Airport is very confusing to try and find somebody there and even to find the right where the airline is landing, so it's not an easy place. So he said, find an easier place that's a little closer to where I am, and then call me back and tell me where you are and I'll come pick you up. That's a very logical explanation for someone that is not familiar with driving in L.A. or L.A. It was not a very logical explanation to say that he wanted to go to Las Vegas and he was staying in Hollywood, and in order to be near the freeway, he went to a hotel next to the airport, because all you have to do is get on the Hollywood freeway to get to Las Vegas. You don't go out to the airport. You mean when the Rakowskis were touring around Hollywood? And then they said they went out to the airport because they wanted to be near the freeway to get to Las Vegas. They went out towards the airport, which all the freeways merge towards the airport. You can get off on the freeways very easily to Vegas from there. You get on the TEN very easily from there. And it's more like, because if you're in Hollywood, you're not very close to a freeway to go to Las Vegas. Except for the Hollywood freeway. The 210? No, no, the Hollywood freeway. It goes right through Hollywood, down to town, and then you keep going straight out on the TEN. They may not have known, because they were lost. They said they got lost and didn't know where they were going, and that's why they were there. It's an interesting tale on both sides. That's correct, Your Honor. But you've got to think that he had all these family members and they were on a family vacation. It wasn't as if he had planned to stay in L.A. because the aunt was supposed to be with him, and she left earlier than planned. So this was not planned in advance, this particular itinerary, where they would be staying. It was not planned. It was not orchestrated. So how could he... See, the problem with this, with your argument, is that's all true if you believe Mr. Rutkowski. If you believe his story about what he was doing, why he did it, where he had been before. But you have to believe the aunt testified also, and the mother testified. The aunt also testified where they were going on the trip. And even Raby knew that he was going on this trip with his family to Disneyland, and he was talking about joining them. He wanted to join them at Disneyland because they were friends. So he knew that they were going on this trip, but it was not planned to be where he was at the time. And if it had been, I mean, if it wasn't planned, then how was he going to pick up drugs? He could not have been carrying drugs in the van until that time period because if you look at, they had nine people in this car with bags, okay? And every time they stopped, bags were taken out, and other people were handling the bags. So there was no way he could have been carrying a bag of drugs around. Where could he have gotten the drugs? He had to have gotten it in that time period. Well, then how could he have planned? I mean, you have to think logically on the timeline on this. How could he have planned to pick up? Did you try this case? Pardon? No, I did not. I just did the appeal, Your Honor. Okay. I was wondering whether you made this argument to the jury and what they thought of it. I still, I'm arguing, Your Honor, that there was insufficient evidence for a rational jury to have found beyond reasonable doubt that he was involved. There was no evidence. And again, if you look at the time, where could he have picked up these drugs to have supposedly given to somebody else? And it was Ravy that was in control of it. Ravy was the one that was told to pick up the bag. Ravy was the one that said, this is how we're going to package it. Ravy was the one that determined where to go. Why, if they were picking up drugs from Ropowski, would they have gone to a hotel in Hollywood? Why didn't they just stay at the airport and turn around and go right back to Hawaii? Why did they have to go and spend time in a Hollywood hotel, the same hotel that Ravy and this other co-conspirator, Ione,  but they had stayed there in January to also consummate a drug deal and work out a drug deal. Why did they have to go there? They met with other people while they were there. What were they doing with Ropowski? They were there for this drug deal at this hotel in Hollywood. They all came out to the airport to meet with Ropowski. They went into a bathroom, according to someone, where they looked at drugs. What were they doing with Ropowski, who was on his way to Disneyland? Ropowski was called by his friend, Ravy, that said, Look, I need a ride. I don't have a credit card. I can't rent a car to get to my hotel in Hollywood. Would you pick me up? Ravy didn't tell Ropowski that he had two other people with him, okay? As a good friend, and he was a good friend. He had done many things for Ravy as a friend, trying to help him. He asked his mother, Can I go? And his mother said, Well, first of all, it wasn't his van. The van was rented by his aunt, so he had no control over the car. He woke his mother up, didn't he? Yes, he did, because they were all asleep. They were all asleep because they were going to go in the morning to Vegas. They were going back to Vegas. He said, Can I do this? And the mother said, Well, okay. So he went, he picked up Ravy, and he told Ravy, I need time to get ready. I've been asleep. Let me just take a shower, get dressed. I'll come and pick you up. So he picked him up. Ravy jumps in the van, and Rakowski says at that time that he sees him with a bag, okay? He puts it in the van. They start to drive off, and he says, Wait a minute. I have only two friends back here. Now, if you look at the testimony of the two friends in the restaurant, they said they got to the restaurant, and Ravy said, Look, I've got to go out and make a phone call. They ordered a meal. They went out. Ravy was gone for a good 40 to 45 minutes. That was testimony that was corroborated by the two that were sitting in the restaurant. Okay, what did he do? If he was going to wait for Rakowski to come and pick him up, then why didn't he stay at the restaurant and eat his food, and then just say, Rakowski, call me when you get here, and I'll come out? No, he didn't. He went out, and he stayed out, and he made several phone calls to other people. There was a perfect opportunity there for Ravy to have drugs delivered because he knew when he was arriving. He picked the hotel he was going to. Did you want to talk about the other issue at all, the 851B issue? Okay, Your Honor. Yes, I would, because I called the other day because I couldn't get a hold of the attorney that did the appeal, and that appeal was dismissed. So now that is a final judgment. So the 851 issue, he has, you know, I can't say that's a viable issue. I would like to reserve two minutes also, so I now have another argument. But on the Eighth Amendment, I think there is an argument, Your Honor. May I just get this clear? You are now conceding or dropping the 851B issue? Well, it doesn't – there was error. The judge did make an error. The judge did not follow the strict compliance with 851. However, now that conviction is final. Although on his other conviction, I did receive a letter that he had sent to the court on that one because the prosecutor in one of his cases has now been released from a job that he was doing because of misconduct, and he believes that there was maybe misconduct on his particular case, but that was not before the court prior. So I don't know on that. There was – the 851 was not complied with as it should have been. No, that's certainly approved, but the question is whether – I don't know, Your Honor. Okay. The case was dismissed by the Supreme Court saying lack of appellate jurisdiction. Well, there are two convictions here, two prior. One you say was dismissed. Is that the one where he was moving to withdraw the guilty plea? Correct. That was the one he had on appeal. Now, the other one was for possession, and that was the one that he is claiming, but it was not before the lower court, but I do have a letter that was written just a few days ago that is claiming that he found out through an investigator that the prosecutor on that case was released from her job because of misconduct, and he believes there was misconduct on his case, but there's nothing that I can bring to the court at this point on that. But the case that was on appeal at the time he was sentenced, that has been dismissed by the Hawaii Supreme Court. So you concede that any error is harmless? It wouldn't do any good, right, Your Honor. My main argument is that I firmly believe that there was insufficient evidence on this case to convict him of conspiracy or possession. I mean, there just is not enough evidence, and if you compare it with the other cases, it's just insufficient for a rational jury to conclude. Eighth Amendment argument, I think that's still a viable argument, even though the Supreme Court came down with the three-strikes law. I think you still have to look at what he did. He has not been involved in drugs. He had these two. What he did is nothing compared to the people who were in for life in California under the three-strikes law. He did two minor drugs. One was possession. You know, all they have to do is take a $2 disc out of a K-Mart. However, I think those defendants had many prior convictions. You need three, is what you mean. Yes, but I think they had more than three. They had many prior, and if you look at Mr. Rakowski has not been. . . Well, I'm doing it. I'm giving it to you, Your Honor. I'd like to reserve it, Your Honor, for rebuttal. Thank you. Thank you. Good morning. Good morning. Tom Brady for the United States. Unless the Court wants to go to another issue, I'll start with the sufficiency of evidence. Well, that seems to be the most colorful. It is. And I want to start with the government's brief on page 21. Judge Ezra in this case at sentencing said that the evidence established beyond not only any reasonable doubt but beyond any doubt at all that the defendant was guilty of the offense charged, the evidence against him was substantive and it was credible. We believe that it was substantial and credible. I want to start out by saying that the evidence against Ravy, Ione, and Hilton was law enforcement caught them cold. These individuals drew attention to themselves on March 28, 2000, when they ran to catch their flight and they almost missed their flight. And it was on the 28th of March that they were photographed by law enforcement who were there for other drug interdiction assignments. It was on the 30th of March, two days later, that the same agents that had photographed these individuals earlier saw both Mr. Ione and Mr. Hilton in the baggage claim area of Honolulu International Airport, and their consensual encounter raised further suspicions. A drug-detecting canine alerted on the bags of Mr. Hilton as well as Mr. Ione, and a subsequent search warrant resulted in the seizure of over five pounds of crystal methamphetamine or ice. Mr. Ravy and Mr. Ione were, I'm sorry, Mr. Hilton and Mr. Ione were subsequently arrested. They were put in separate areas and they made statements to law enforcement, implicating themselves as well as who they knew, a person by the name of Shine, Mr. Murkowski, and as well as another person named Ravy. What is important is that not only that, but Hilton was able to describe where Murkowski lived. He did a drive-by for the police. He also identified him in a photo spread. And probably more importantly, at trial he testified that the black bag that contained the drugs was not his, was not Ravy's, was not Ione, and that the most important part of his testimony was, as the court has already pointed out, he recalls Murkowski, Ione, and Ravy in that bathroom at the Holiday Inn for about ten minutes, which is in complete contradiction to what Mr. Murkowski said. He said he was there for seconds, just enough to say, let's go and come out. And probably just as important, Hilton testified to the letters that Mr. Murkowski had written to him while in prison, trying to persuade him to say that the drugs really were coming from somebody else and not him. And Mr. Murkowski admitted that he wrote that letter. As to Mr. Ione, again, he verified that the bag, the black bag that contained the drugs, did not belong to either himself or Mr. Hilton or Mr. Ravy. It was situated behind the driver who was Mr. Murkowski in the van. He also indicated that he was in that bathroom at the Holiday Inn with Mr. Murkowski, with Mr. Ravy. And in fact, it was Mr. Murkowski who said, it must be, it looks like it's about six to ten pounds in there, in the bag, describing the drugs. And it was Mr. Ione who said that the smell was so strong from the drugs that he had to leave the bathroom. And again, he testified that once Murkowski drove them to their West Hollywood Hyatt Hotel, they stayed there, unpacked, took the drugs out, and put them in the safe. And that's in contradiction to what Mr. Murkowski testified to. Mr. Ravy obviously was the most important witness as far as the involvement of Mr. Murkowski. He was later arrested on the same day as the other two defendants, and he provided incriminating statements regarding himself as well as Mr. Murkowski. He stated that it was Mr. Murkowski who had hired him, who had asked him if he would run drugs for him. They used the cellular telephones to keep in touch, and that he was to meet Mr. Murkowski in L.A. and pick up the drugs, and then return the drugs to Mr. Murkowski once Mr. Murkowski returned to Honolulu. It was Special Agent Dwayne Stickles from DEA who was able to testify to the drug ledger that was recovered from Mr. Murkowski's residence, that it consisted of what appeared to be ice notations and values, and that it also had Shine's name on the ledger. And I know that in the paper submitted to the court that that does not show up, but that was part of the portion that was not zero. What's more important is what the court has already pointed out. Some of Murkowski's story just didn't make sense. He did testify. He elected to testify. He said that he was on vacation with his family members. He acknowledged that he was a friend of Ravy and that he was to a lesser extent a friend with the other two, and that Ravy was going to indicate that he wanted to join them at Disneyland. But when things started to unfold, I think, for Mr. Murkowski, is when he said that Ravy had called him and said, Look, I don't have a credit card. I need a ride. Can you come pick me up? Now, Mr. Murkowski, on the one hand, in his direct testimony, said, The signs, the road signs around LAX were great, and we could get to Las Vegas easily because the road signs were there were very good next to the airport, and that's why we went to the Holiday Inn near the airport, so when we wanted to go back to Vegas, we could see the signs. At the same time, he said, I didn't understand. I was confused about driving in LA. I didn't know where I was, so I didn't want to drive to the airport, and that's why I told Ravy, Come a little bit further closer. Obviously, the government argued in closing was Mr. Murkowski was very versed in drug trafficking, and he didn't want to go to the airport where he knew law enforcement would be and possibly be caught, and therefore, he had Ravy come closer, which was only about a five- or ten-minute drive from where the Holiday Inn was, and there he met all three of the individuals. Obviously, Mr. Ravy said that they... Where did Mr. Ravy come from when he was at the airport? From Los Angeles Airport? Yeah. Had he flown into Los Angeles? He had flown in from Honolulu, Hawaii, and all three of them were... Had he called Mr. Murkowski at this hotel that Mr. Murkowski just happened to go to near the airport because the hotel in Hollywood wasn't close to a freeway? That's what was testified to. And he called him at this hotel that Mr. Murkowski hadn't expected to be at because he wanted to go to Disneyland after he flew in from Honolulu? Correct. But the testimony also was by both Mr. Murkowski and Mr. Ravy that they had been keeping in contact through cellular telephone and that, in fact, Mr. Ravy, while still in Honolulu, had called Mr. Murkowski and had confirmed that everything was okay, everything was set, and that they would be coming to L.A. shortly. Okay. Is there anything further on the sufficiency of evidence that the Court is concerned about? Otherwise, I'll address the Section 851. Well, I think Counselor said there's no prejudice. It might be worth addressing. What do you think about the idea that the purpose of 851B is to advise the defendant that these charges are going to be raised and now, contest them now or forever hold your peace? Correct. Now, if you don't give him that warning, wouldn't the remedy be logically that you don't have to forever hold your peace? You weren't told, so you're free to raise it later? I think that's a logical argument. But I think in this case, the facts are such that it is clear that he had notice. And I know that the Court is very knowledgeable about 851 and is very concerned about notice and very concerned about whether or not there was specificity in the information itself. So you've been reading Severino, huh? Yes. It was a good dissent, wasn't it? It was a very good dissent. And I agree. To cut to the chase, I'm not sure how TSR really cuts it in terms of the 851 notice. On the other hand, 851B is different from 851A. You've distinguished that in that footnote, too. And I think you're correct, but the facts of this case is he specifically said, I'm objecting to the mandatory life, and I am putting the Court on notice that I'm going to seek a private attorney to see if I can vacate these convictions. So as far as notice, in actuality, he had notice of those.  This was his time to prove it. He did say that he knew that they knew about these convictions, but he didn't know there was a procedure and that this is what you're going to have to show is not correct. He wasn't told what anything was. Without a doubt, the Court did not instruct him pursuant to 851B, without a doubt. And if you are going to hold somebody to say this is your one time and then you don't tell them that, it would seem that then you shouldn't be able to limit him to that one time. But I don't know that that's a problem for you, particularly in this case. I would submit it is not, given the facts that we have as far as notice and the defendant actually. No, no, not given that. I mean, given the fact that there is nothing to contest. Well, and that goes, I think, to the ineffective assistance of counsel argument as well. Counsel was really bootstrapped at this time. It was well past five years for the statute of limitations, 851E. Those convictions were already final, and there was a gallant attempt to revive them, a motion to. . . Well, I think you could. First, I read the statute. If you have a constitutional argument, and maybe even a non-constitutional argument, you can raise it in this proceeding. Yes. And say, don't count on these convictions. They really were no good. And you can litigate it there. That is correct. Does the Court have any other concerns? Otherwise, I'll rest on my feet. I don't think so. Thank you. I have a question. When you're talking. . . Can I ask a question? When you're talking about if 851B was not adhered to like it's supposed to be, does that. . . would that mean, then, that he still could bring up issues of past convictions? That was the question I had. And I didn't get an answer. But anyway. . . Well, you ought to ask your friend over there. He said it was a case of theory. So I have a question on that, because there may be a problem with one of his convictions still. And there were not two final. The objection that his attorney had at the time of the presentence report on his prior convictions was for the purpose of career offender, because his convictions did not satisfy that statute, okay, because one was for possession only. And he does not have as well versed in drug trafficking. He wasn't. He had a conviction for possession, and he had a conviction, a minor conviction, one he appealed for an eighth of an ounce that he was a part of, and that was in. . . 93 was his last incident. And he had been clean since then because he was on probation and checked. So for the government to say he had this history of drug trafficking and he knew how to do it, I think that's an incorrect statement because he doesn't have that. He had two minor priors. There was no controlled delivery either. If Ravy said that I'm supposed to deliver these drugs, why didn't they do that? There was no really concrete direct evidence against Mr. Rakowski. It was all circumstantial. It was all direct testimony of people who. . . But the testimony did not. . . You might not believe those people. I might not believe those people. But it didn't jive, their testimony. Even if they said, I don't know where the black bag came from, I didn't see it before, that doesn't mean that Rakowski had it because, yes, no one had the black bag when they arrived in L.A. Somebody had to have gotten the black bag of drugs after the fact. So just because they said, well, I didn't see the black bag, we didn't bring it with us, well, yes, you don't bring drugs with you when you're going to take them back. That's logical. But that doesn't mean anything. It doesn't say that Rakowski had the black bag or gave it. Hilton identifying Shine as Mr. Rakowski doesn't mean anything either because they were friends. They were acquaintances. They knew each other. And Shine. . . Mr. Rakowski was known by Shine as a nickname from his childhood. It wasn't a drug name he was given. It was a nickname from his family. He was called that. So, you know, there's just too many contradictions. The telephone calls between the two. There's no evidence that shows what was the content of the conversations. What were these phone calls all about? You know, they were friends communicating with each other. Either narcotics or going to Disneyland, one or the other. That's right. But the Disneyland was over by the time he called. And he was calling for a ride. He was calling, hey, buddy, you know, I need a ride. I can't afford to rent a car. Come and get me. Crown Plaza is down from the airport but on a main road. It's still easier to get someplace out of LAX because LAX is huge and confusing for anyone that is not familiar with LAX. I even don't like to drive around LAX. And I'm familiar with it. I'm from Southern California. It's confusing. So it was very logical for somebody not familiar to say, look, get away from the airport a little bit. I'm close to the airport, but just get out of LAX. Well, too bad you didn't try this case. You've got some interesting theories. But maybe you would have done all right with the jury. Well, Your Honor, I would like you to take a look at the evidence and see. It is not sufficient for a rational jury to find. I think we have your argument. I appreciate it, Your Honor. Thank you very much. Thank you. Thank you. Both cases argued will be submitted. The next case on the calendar is divided into two separate arguments. The first one is going to be U.S. v. Velasco.
judges: Browning, Reinhardt, Thomas